IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEILANI JIMENEZ, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>COUNTY OF ALAMEDA,<br><br>    Defendant. | No. C 13-4620 CRB<br><br>**ORDER GRANTING SUMMARY JUDGMENT IN PART AND DENYING SUMMARY JUDGMENT IN PART** |

Defendants Erik Holm, Derek Freligh, Jacob Cesena ("Defendant Deputies"), and the County of Alameda (the "County"), move for partial summary judgment on Plaintiffs' constitutional claims. See Motion (dkt. 61). Those claims, brought under 18 U.S.C. § 1983 by Jimenez's wife and five children ("Plaintiffs") after Jimenez's suicide at Santa Rita Jail, allege that supervision at the prison was so deficient that it violated Jimenez's Eighth and Fourteenth Amendment rights. See Compl. (dkt. 1). The County responds that Jimenez was heavily supervised. See Mot. For the following reasons, the Court GRANTS summary judgment in favor of Deputies Holm and Cesena, GRANTS summary judgment for the County on the Monell claim, and DENIES summary judgment to Deputy Freligh.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

These facts are viewed and presented in the light most favorable to Plaintiffs. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).

### A.     Jimenez's Previous Suicide Attempts

Dennis Jimenez was in custody at Santa Rita Jail from March 11, 2012 until his death on September 1, 2012. See SAC (dkt. 25) ¶ 19.[1] On August 9, 2012, Jimenez attempted suicide by cutting his wrists. See id. ¶ 20. Three days later, Jimenez attempted suicide again by hanging himself with a bed sheet. See id. Following this second attempt, the jail's medical staff transferred Jimenez to the mental health unit at Santa Clara County jail, where he received in-patient psychiatric care for eleven days. See Santa Clara Records (dkt. 36-3) at 8–9 of 81.

### B.     Jimenez's Classification as "High Risk" Upon Return to Santa Rita

Santa Rita Jail classified Jimenez for "intensive observation" on his return, and prison policy dictated that he receive a well-being check, recorded on an Intensive Observation Log ("IOL"), every fifteen minutes. See Holm Depo. Tr. (dkt. 39-1) at 19:15–25, 20:8–12. These checks required a direct visual observation of the inmate. See id. (dkt. 39-1) at 21:22–22:6. Jimenez was not permitted to have bed sheets or underwear because he might use those items to harm himself. See Freligh Decl. (dkt. 36-4) at 2:7-10. Given the location of Jimenez's cell, a deputy needed to leave the prison guard office to observe Jimenez. See Holm Depo. Tr. (dkt. 39-1) at 22:7–10. Defendant Deputies knew Jimenez was suicidal and knew that he had made two previous suicide attempts. See Motion (dkt. 61) at 4 (citing Freligh Decl. (dkt. 36-4) at 2:2–5; Holm Decl. (dkt. 36-8) at 2:3–7; Cesena Decl. (dkt. 36-9) at 2:9–10).

### C.     Background on Jimenez's Housing Unit at Santa Rita Jail

On the date of his suicide, Jimenez was incarcerated in Housing Unit One, an administrative segregation unit. See Holm Depo. Tr. (dkt. 39-1) at 19:7–8. Inmates in administrative segregation require extra supervision and have limited contact with other inmates. See id. at 16:14–16. This particular housing unit had six pods, each containing between fourteen and sixteen cells facing in to the center. See id. at 37:11–14. Inmates in

---

[1] The parties do not dispute these facts, but they only support them with references to the Complaint. See generally Compl.; Mot.; Opp'n.

1    administrative segregation each get one hour of "pod time," during which they are allowed to
2    engage in recreational activities in the center area of the unit without a deputy's physical
3    presence. See id. at 34:15–36:20. "Pod time" in each of the six pods runs concurrently, but
4    there are only two to three deputies monitoring these activities, so it is impossible to have
5    eyes on all six pods simultaneously. See id. at 40:1–11.

### D. Another Inmate Passes Jimenez a Bed Sheet on the Day of His Suicide

At some point during Gene Mabry's pod time on September 1, 2012, Mabry sneaked a bed sheet to Jimenez by hiding the sheet in his clothes after leaving his own cell, lying on the floor, and unraveling the sheet under Jimenez's cell door.[2] See Mabry Depo. Tr. (dkt. 66-1) at 16–18, 20, 24–25, 28. According to Mabry, this endeavor took approximately three to five minutes. See id. at 25. Mabry stated that a lack of deputy presence made him feel comfortable passing the sheet to Jimenez. See id. at 44–45.

### E. Whether Deputies Were Conducting Fifteen Minute Checks Around the Time Inmate Mabry Passed Jimenez the Bed Sheet Used in His Suicide

The Intensive Observation Log indicates that Deputy Freligh conducted a well-being check on Jimenez at 1:24 PM. See IOL (dkt. 39-4). But Plaintiffs question the integrity of this log entry. They rely on the depositions of inmates Leon Evans and Gene Mabry to argue that Deputy Freligh did not check on Jimenez during Mabry's hour of pod time or for the first half hour of Evans's pod time. See Opp'n (dkt. 75) at 16. Mabry stated that fifteen minutes passed between his sneaking a bed sheet to Jimenez and the end of pod time. See Mabry Depo. Tr. (dkt. 66-1) at 42. Mabry also stated that he did not see any deputies come out to observe Jimenez or walk by Jimenez's second floor cell during his pod time. See id. at 44 ("I don't remember no - - no deputies coming out during my pod time. That's how I was fortunate to pass the sheet to - - [Jimenez]."). After Mabry gave the sheet to Jimenez, he saw Jimenez wrap it around himself as though he were cold. See id. at 43:21. Defendant Deputies assert that they did not know Jimenez obtained or was likely to obtain that bed

---

[2] Defendant Deputies knew that inmates passed hot water and small items through cracks in cell doorways from time to time; inmates would use a chip bag to guide water into cracks and pour the water through. See id. (dkt. 39-1) at 76:12–78:8.

3

sheet.  See Feb. Reply Br. (dkt. 68) at 3.

Plaintiffs also highlight Inmate Evans's testimony regarding when he noticed something was wrong with Jimenez and when he alerted Deputy Cesena to the problem.  See Opp'n (dkt. 75) at 12–13.  Evans's witness statement and deposition are internally contradictory.[3]  See Evans Depo. (dkt. 66-2) at 8–9.  Evans states that—at the beginning of his pod time—he saw Jimenez face down in his cell with a sheet around his neck, after which he ran down to alert the deputies.  See Evans' Witness Statement (dkt. 39-5); Evans Depo. (dkt. 66-2) at 8–9.  In a follow-up statement, Evans states that he had already "been out on pod time for a long time" at that point.  See id.  Evans states that he "initially saw [Jimenez] when [he] first came out and was concerned about [Jimenez].  When [he] saw [Jimenez] at the end of [his] pod time, [Jimenez] was hanging and didn't look right."  Id.  Plaintiffs thus assert that despite Deputy Freligh's notation on the Intensive Observation Log that he had conducted a 1:24 PM well-being check, inmate depositions create a triable issue of fact on whether Deputy Freligh checked on Jimenez during Mabry's pod time or the first half of Evans's pod time.  See Opp'n (dkt. 75) at 16.

**F.    Inmates Report that Jimenez Has Committed Suicide**

During the hour before Jimenez's suicide, Deputies Holm and Freligh state that they responded to an incident in a hallway outside their guard office.  See Holm Depo. Tr. (dkt. 39-1) at 53:7–20.[4]  As Deputies Holm and Freligh addressed that incident, Deputy Cesena remained in the guard office supervising the pods.  See id. at 53:19–24.  Deputy Cesena was in his first month on the job and still training.  See Cesena Decl. (dkt. 36-9) at 1.

At 1:30 PM, just six minutes after the disputed 1:24 PM well-being check recorded by Deputy Freligh in the Intensive Observation Log, Inmate Evans came to the guard office and told Deputy Cesena that he thought Jimenez might be trying to commit suicide.  See Cesena

---

[3] Defendants argue that the witness statement is inadmissable hearsay, but that argument is moot because Evans's deposition testimony includes similar inconsistency.  See Evans Depo. Tr. (dkt. 66-2).

[4] Deputy Holm stated in his deposition—almost two and a half years after Jimenez's suicide—that he does not recall the details of the incident that drew himself and Deputy Freligh into the hall.  See id. at 53:13–14.

4

Decl. (dkt. 36-9) at 2.  Deputy Cesena alerted Deputies Holm and Freligh and quickly went to Jimenez's cell.  See id.  Deputy Cesena saw Jimenez "hanging from a bed sheet around his neck that was tied to the upper bunk of his cell."  See id.  He was "laying face down toward the ground."  See Cesena Depo. Tr. (dkt. 39-3) at 59:19.  Deputies Cesena and Freligh entered the cell and took Jimenez down.  See Cesena Decl. (dkt. 36-9) at 2.  A nurse immediately started resuscitation efforts.  See id.  These efforts were unsuccessful.

### G. Relevant County Policy

County policy states that deputies who are assigned to administrative segregation units must supervise inmates during their pod time, see Holm Depo. Tr. (dkt 39-1) at 37:23–38:24, paying closer attention to suicidal inmates, see id. at 46:6–11.  There are six different pods within Housing Unit One.  See Holm Depo. Tr. (dkt 39-1) at 40:12–22.  All pods run pod time concurrently, and there are only two to three deputies assigned to a housing unit.  See id. at 40:23–41:6.  Plaintiffs thus note that it is impossible to have a deputy present at each cell when inmates are let out for pod time.  See Freligh Depo. Tr. (dkt 39-2) at 66:24–67:2.

Prison policy prohibits inmates from passing items to each other during pod time.  See id. at 48:8–49:3.  After Jimenez's two previous suicide attempts, deputies were required to check on him every fifteen minutes and record these checks on the Intensive Observation Log.  See IOL (dkt. 39-4).  These checks required a direct visual observation of the inmate. See Holm Depo. Tr. (dkt. 39-1) at 21:22–22:6.  Prison policy further prohibited Jimenez from having bed sheets or underwear because he might use those items to harm himself.  See Freligh Decl. (dkt. 36-4) at 2:7-10.

After Jimenez's suicide, Defendant Deputies were not disciplined for their actions on the day of his death.  See Cesena Depo. Tr. (dkt. 39-3) at 73:14–19.  The County did not place them in any additional training programs.  See id. at 73:7–13.  An unnamed sergeant told Deputy Holm that his actions were within policy on the same day that the sergeant received Holm's report on Jimenez's suicide.  See Holm Depo. Tr. (dkt. 39-1) at 65:7–18.

### H. Procedural History

Plaintiffs filed their original complaint in October 2013 and eventually filed a Second

5

Amended Complaint in February 2015.  See generally Compl. (dkt. 1); SAC (dkt. 25). Plaintiffs allege three causes of action under 42 U.S.C. § 1983, arguing that (1) Defendant Deputies wrongfully caused Jimenez's death, violating his Eighth and Fourteenth Amendment rights through their deliberate indifference to his medical needs, see id. ¶¶ 31–32; (2) Defendant Deputies deprived Plaintiffs of their constitutional rights to familial relationship, see id. ¶ 36; and (3) Defendant County's policies were deliberately indifferent to Jimenez's medical needs under Monell, see id. ¶ 40.  Plaintiffs also allege a state law wrongful death cause of action against Defendants.  See id. ¶ 49.

Defendants moved for partial summary judgment in June 2015.  See generally 2015 Mot. (dkt. 35).  In October 2015, this Court denied the motion without prejudice to permit Plaintiffs to take the depositions of two inmates—Gene Mabry and Leon Evans—whose testimony might present triable issues of fact about Defendant Deputies' observation of Jimenez on the date of his death.  See generally Order Denying Summary Judgment (dkt. 54). Defendants again moved for partial summary judgement in January 2016.  See generally Mot. (dkt. 61).  After Plaintiffs submitted their Opposition and Defendants submitted their Reply, see generally Jan. Opp'n (dkt. 65); Feb. Reply (dkt. 68), Plaintiffs filed a declaration arguing that the parties needed to exchange expert witness information under Rule 26.  See generally Feb. Decl. (dkt. 69); Fed. R. Civ. P. 26.  The Court ordered the exchange of expert witness information.  See generally Feb. 2016 Minute Entry (dkt. 72).  Plaintiffs filed a second Opposition to Defendants' motion on July 8, 2016.  See generally Opp'n (dkt. 75). The partial summary judgment motion is now properly before the Court.

## II.    LEGAL STANDARD

The Court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict" for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

1 A fact is material if it could affect the outcome of the suit under the governing law. Id. at
2 248–49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).
3    If the evidence presented is "merely colorable" and not "significantly probative," the
4 court may decide the legal issue and grant summary judgment. Id. at 249–50 (citations
5 omitted). To determine whether a genuine dispute as to any material fact exists, the court
6 must view the evidence in the light most favorable to the non-moving party. Id. at 255. In
7 determining whether to grant or deny summary judgment, it is not a court's task "to scour the
8 record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th
9 Cir. 1996) (internal citation omitted). Rather, a court is entitled to rely on the nonmoving
10 party to "identify with reasonable particularity the evidence that precludes summary
11 judgment." See id.

## III. DISCUSSION

Defendants argue that Plaintiffs have failed to establish a genuine dispute of material fact on whether Deputies Holm, Freligh, and Cesana acted with deliberate indifference to Jimenez's medical needs. See Motion (dkt. 61) at 8–13. Defendants also argue that Plaintiffs have not established a triable issue on their Monell claim, which asserts that an Alameda County policy, custom, or practice was a cause of Jimenez's suicide. See id. at 13–14. For the following reasons, the Court GRANTS summary judgment to Holm and Cesana on the individual claims against them and to the County on the Monell claim, but DENIES summary judgment to Freligh on the individual claims against him.

### A.    Claims Against Deputies Holm and Cesena

The Court concludes that Plaintiffs have not established a triable issue[5] on the individual claims against Holm and Cesena, through which Plaintiffs argue that the Deputies acted with deliberate indifference to Jimenez's medical needs.

---

[5] As a preliminary matter, the Court notes that Defendants object to the admission of both inmate Evans's witness statement, see Statement (dkt. 39-5), and all of the reports from experts Joel Goodman and Todd Wilcox, see Goodman Report (dkt. 76-1); Goodman Suppl. Report (dkt. 76-3); Wilcox Report (dkt. 76-4). The Court concludes that the disputes are moot because Defendants do not challenge Evans's deposition testimony, which refers to the same events and is based on personal knowledge, and the Court has not relied on the expert reports here.

United States District Court
For the Northern District of California

### 1. Legal Standard Applicable to Failure to Supervise Claim

A plaintiff arguing an Eighth Amendment failure to supervise claim must show (1) that the conditions of incarceration "pos[e] a substantial risk of serious harm," and (2) that prison officials had a sufficiently culpable state of mind, one rising to the level of "deliberate indifference." See Farmer v. Brennan, 511 U.S. 825, 834 (1994). Courts apply the deliberate indifference standard because failure to prevent harm must amount to a "punishment" to constitute a violation of the Eighth Amendment. See id. "Deliberate indifference is a high legal standard. A showing of . . . negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." See Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004); Farmer, 511 U.S. at 835 (stating that deliberate indifference requires more than an ordinary lack of due care).[6] Deliberate indifference to an inmate's serious medical need can support an Eighth Amendment cause of action brought under 42 U.S.C. § 1983. See Castro v. Cty. of Los Angeles, No. 12-56829, 2016 WL 4268955, at *1 (9th Cir. Aug. 15, 2016).

The deliberate indifference standard does not require proof that prison officials acted with purpose to cause harm or knowledge that harm will result. See Farmer, 511 U.S. at 835. Instead, a plaintiff must show that prison officials "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." See id. at 837. The official must be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." See id. For Plaintiffs to survive summary judgment, they must establish a genuine dispute of material fact as to both prongs of the deliberate indifference test: (1) whether Jimenez was confined under conditions posing a "substantial risk of serious harm" and (2) whether the deputies were deliberately indifferent to that risk. See Lolli v. Cty. of Orange, 351 F.3d 410, 420 (9th Cir. 2003).

---

[6] The Ninth Circuit has stated that a "pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment . . . ." See, e.g., Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998). The same constitutional protections apply to Bivens claims as to § 1983 claims, as the former regards actions against federal prison officials and the latter claims are "counterparts against state officials." See Farmer, 511 U.S. at 839.

8

## 2. Analysis of Individual Claims Against Holm and Cesena

It is undisputed that Defendant Deputies knew that Jimenez was suicidal and that he had made two previous suicide attempts. See Motion at 4 (citing Freligh Decl. (dkt. 36-4) at 2:2–5; Holm Decl. (dkt. 36-8) at 2:3–7; Cesena Decl. (dkt. 36-9) at 2:9–10). Plaintiffs argue that Defendant Deputies' supervision of Jimenez, given that they had this knowledge, was so deficient that it was deliberately indifferent to his medical needs. See Opp'n at 18. Defendant Deputies argue that they were not deliberately indifferent in their supervision of Jimenez because they did not actually know that he had obtained or was likely to obtain the bed sheet with which he killed himself. See Feb. Reply Br. (dkt. 68) at 3.

The following facts are not disputed by the parties. Jimenez attempted suicide on August 9 and August 12, 2012 while in Santa Rita Jail. See Motion at 3; Opp'n at 5. On the date of his suicide, September 1, 2012, Jimenez lived in Housing Unit One, in administrative segregation. See Holm Depo. Tr. (dkt. 39-1) at 19:7–8. Inmates in administrative segregation require, for various reasons, extra supervision and limited contact with other inmates. See id. at 16:14–16. Jimenez was not permitted to have bed sheets or regular underwear because of the risk that he would use those objects to harm himself. See Freligh Decl. (dkt. 36-4) at 2:7-10. Given his recent suicide attempts, deputies monitored Jimenez and recorded the well-being checks that they conducted on an Intensive Observation Log. See Holm Depo. Tr. (dkt. 39-1) at 19:15–25. Prison policy required a deputy to check on Jimenez every fifteen minutes. See id. at 20:8–12. These checks required a direct visual observation of Jimenez, which required a deputy to leave the guard office near the pod and approach Jimenez's cell. See id. at 21:22–22:6–10.

Plaintiffs argue that despite the Intensive Observation Log entry indicating that Deputy Freligh checked on Jimenez at 1:24 PM, inmate depositions suggest that he did not conduct a check during Mabry's pod time or during the first half of Evans's pod time. See Opp'n (dkt. 75) at 16. Defendant Deputies respond that Deputy Freligh conducted a well-being check on Jimenez at 1:24 PM, just as the log indicates. See Motion at 5.

Even if the Court accepts as true Plaintiffs' assertion that Deputy Freligh's 1:24 PM

well-being check did not actually take place, Plaintiffs have failed to establish that Deputies Holm's and Cesena's conduct rose to the level of deliberate indifference. Although the parties agree that Holm and Cesena knew Plaintiff was suicidal, there is no evidence that they failed to conduct their well-being checks, and there is no evidence that they knew Jimenez obtained the bed sheet that he used to kill himself. See Lolli v. Cty. of Orange, 351 F.3d 410, 420 (9th Cir. 2003); Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1018 (9th Cir. 2010) (concluding that a nurse was not deliberately indifferent because she was not aware than an inmate had acquired the gauze that he used to hang himself).

Furthermore, given Plaintiffs' inability to produce evidence that Holm and Cesena failed to follow prison policy and conduct the required well-being checks, the Court concludes that the supervision Holm and Cesena provided to Jimenez was not comparable to other Eighth Amendment cases involving inadequate supervision that amounted to deliberate indifference. Cf. Lemire v. California Dep't of Corr. & Rehab., 726 F.3d 1062, 1076–77 (9th Cir. 2013) (discussing a situation in which a prisoner committed suicide after prison officials held a meeting that withdrew all floor staff from a building that housed mentally ill inmates for three and a half hours). The individual claims against Holm and Cesena thus fail, and the Court GRANTS summary judgment in those two deputies' favor.

### B. Section 1983 Claim Against Deputy Freligh

As stated at the hearing on this matter, the Court concludes that Plaintiffs have raised a genuine dispute of material fact over whether Deputy Freligh conducted the 1:24 PM well-being check on Jimenez that was recorded on the Intensive Observation Log. See Hearing Tr. The Court thus DENIES Deputy Freligh summary judgment on the individual claims brought against him.

### C. Monell Claim Against Defendant County of Alameda

For the following reasons, the Court concludes that Plaintiffs have failed to establish a triable issue on whether Jimenez's suicide was the result of a County policy, custom, or practice and GRANTS summary judgment in favor of the County on the Monell claim.

In order to hold a municipality liable under § 1983, a plaintiff must either show that (1) the municipal employee committed the constitutional violation pursuant to a municipal policy, practice or custom; (2) the employee who committed the constitutional violation was an official with "final policy-making authority" and that his action thus constituted official government policy; or (3) an official with final policy-making authority ratified a subordinate's unconstitutional action. See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 708 (1978); Gillette v. Delmore, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

Plaintiffs argue that the County's policy regarding the supervision of its employees and its "staffing policy and/or concurrent pod time policy" were the moving force behind "Defendant Deputies' failure to monitor all inmates on pod time which ultimately caused Mr. Jimenez's harm." See Opp'n at 19. Plaintiffs also assert that because County policy makers did not "discipline[], retrain[], or reprimand[]" Defendant Deputies after Jimenez's suicide, the County thus ratified their actions. See id. at 20. These arguments fail.

### 1. County Policy, Practice or Custom

Plaintiffs assert that the County's "staffing policy and/or concurrent pod time policy" and a policy of omission regarding the supervision of its employees led to "Defendant Deputies' failure to monitor all inmates on pod time which ultimately caused Mr. Jimenez's harm." See Opp'n at 19. To prove a Monell claim under this theory, Plaintiffs must show that Jimenez "(1) possessed a constitutional right of which [he] was deprived; (2) that the [County] had a policy; (3) that the policy amounts to deliberate indifference to [Jimenez's] constitutional right; and (4) that the policy is the moving force behind the constitutional violation." See Anderson v. Warner, 451 F.3d 1063, 1070 (9th Cir. 2006) (citations omitted).

#### i. Staffing Policy

Plaintiffs argue that the County's staffing policy and/or concurrent pod time policy led to the alleged constitutional violation here. The parties do not dispute that there are six different pods within Housing Unit One, the pods run pod time concurrently, there are only two to three deputies assigned to the housing unit, and it is impossible to observe all inmates out on pod time at once. See Holm Depo. Tr. at 40.

11

But Plaintiffs also note many policies that the County implemented protect inmates like Jimenez. Plaintiffs state that deputies assigned to administrative segregation are required to supervise inmates on pod time, see id. at 37:23–38:24, and pay closer attention to suicidal inmates, see id. at 46:6–11. Plaintiffs reference a prison policy prohibiting inmates from passing items to each other during pod time. See id. at 48:8–49:3. The County put Jimenez under intensive observation, requiring that deputies visually check him every fifteen minutes and record their check on an Intensive Observation Log. See IOL (dkt. 39-4). Plaintiffs' expert concedes that the County's policies, if properly implemented, were adequate to prevent inmate suicides. See Goodman Depo. Tr. (dkt. 76-2) at 77:2–8. This expert further states that "[i]n [his] professional opinion, . . . deviations from policy resulted in . . . Mr. Jimenez's . . . wrongful death." See Goodman Report (dkt. 76-1) at 16.

Plaintiffs' expert references the number of suicides attempted and completed within the County's jails and opines that this must be the result of negligent supervision. See Goodman Report (dkt. 76-1) at 17. But Plaintiffs do not provide evidence establishing a causal link between a staffing decision and inmate suicide attempts. Additionally, the number of suicide attempts on which Plaintiffs' expert relies are County-wide, and not specific to the supervision policy of the Housing Units at Santa Rita Jail. See id. Combined with the fact that (1) inmates in administrative segregation are physically isolated from other inmates, (1) not permitted to pass items to each other, (3) the County did not know inmates passed bed sheets between cells in administrative segregation, and (4) the County prohibited suicidal inmates from possessing items with which they might hurt themselves, the Court concludes that Plaintiffs have not established that the County's policies were a "moving force" behind a deprivation of Jimenez's rights. See Anderson, 451 F.3d at 1070.

### ii.   "Policy of Omission" or Failure to Train

Plaintiffs' argument premised on a "policy of omission" or "failure to train" also fails. An omission can serves as a basis for liability if it reflects a "deliberate" or "conscious" choice, amounting to a "policy," and if that choice "amounts to deliberate indifference to the rights of persons with whom" law enforcement comes into contact. See City of Canton v.

12

Harris, 489 U.S. 378, 389 (1989).  A municipality is "not liable under § 1983 unless a municipal 'policy' or 'custom' is the moving force behind the constitutional violation." See id.  "[W]hen the need to remedy the omission 'is so obvious, and the inadequacy so likely to result in the violation of constitutional rights . . . the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" See Castro, 2016 WL 4268955, at *2 (quoting Harris, 489 U.S. at 390).

Plaintiffs argue that the County had a policy of omission regarding the training of its employees.  Plaintiffs cite their expert's opinion that the County did not properly train its deputies in recognizing the signs and symptoms of mental illness and depression that could lead to suicidal behavior.  See Opp'n (dkt. 75) at 8; Goodman Report (dkt. 76-1) at 17.  But this argument only addresses a failure to train deputies in identifying suicidal inmates, not in how to supervise or care for them.  See id. at 17–18.  The parties do not dispute that staff at Santa Rita Jail properly identified Jimenez as suicidal.  Because Jimenez was properly identified as suicidal, failure to train staff in identifying symptoms of mental illness and depression could not have been a moving force in his suicide.  See Harris, 489 U.S. at 389.

Additionally, Plaintiffs argue that the County failed to supervise its employees.  See Opp'n at 18.  Plaintiffs note that there are no cameras that record the activities in Housing Unit One.  See Holm Depo. Tr. at 30:13–19.  Plaintiffs thus state that there is no independent method of verifying whether deputies actually conduct the well-being checks that they self-report on the Intensive Observation Log.  See Opp'n at 6.  They argue that the County relies solely on "the honor system" to ensure deputies execute these checks.  See Opp'n at 6; Cesena Depo. Tr. at 76:3–21.  Plaintiffs provide no evidence of previous incidents in which deputies failed to execute the fifteen minute well-being checks they represented that they had conducted, and the Court cannot conclude that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [County] can reasonably be said to have been deliberately indifferent to the need." See See Castro, 2016 WL 4268955, at *2 (quoting Harris, 489 U.S. at 390). The Court concludes that Plaintiffs fail to establish a triable issue under this Monell theory.

13

### 3. Ratifying Unconstitutional Action

Plaintiffs finally argue that because policymakers within the County did not "discipline[], retrain[], or reprimand[]" Defendant Deputies after Jimenez's suicide, the County thus ratified the Deputies' actions, rendering the County liable for a constitutional violation. See Opp'n (dkt. 75) at 20. To survive summary judgment on this theory, Plaintiffs must present triable issues of fact on whether a final policymaker consciously and affirmatively chose to ratify an unconstitutional action such that the county adopted that action as official policy. See Gillette, 979 F.2d at 1348. "To hold [municipalities] liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle respondeat superior liability into section 1983," thereby creating an "end run around Monell." See id.

Here, Plaintiffs note that a sergeant told Defendant Deputies that their actions were within policy before any investigation into those actions commenced. See Holm Depo. Tr. (dkt. 39-1) at 65:7–24. No internal investigation was conducted. See Cesena Depo. Tr. (dkt. 39-3) at 67:16–18. But Plaintiffs do not present evidence that the unnamed sergeant they reference was a final policymaker. See Gillette, 979 F.2d at 1348.

Furthermore, Plaintiffs present no evidence that this statement was an affirmative decision to adopt Defendant Deputies' actions as official policy. Instead, Plaintiffs simply assert these failures set a bad example and reflected a "don't rock the boat" attitude. See Opp'n at 20 (citing Goodman Report at 25). The Court thus concludes that Plaintiffs do not identify evidence establishing a triable issue on whether the County's failure to discipline, retrain, or reprimand Defendant Deputies amounted to adopting or ratifying their actions as policy. Plaintiffs' Monell claim fails and the Court GRANTS summary judgment in favor of the County on that claim.

//

//

14

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS summary judgment for Deputies Holm and Cesena on the individual claims brought against them, GRANTS summary judgment for the County on the Monell claim, and DENIES summary judgment on the individual claims brought against Deputy Freligh.

**IT IS SO ORDERED.**

Dated: August 24, 2016

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE